Good morning, gentlemen. Before we begin, do we have some sort of a motion? I do, Your Honor. I have a motion for me to file a supplemental case to People v. Carl Henrickson, known as Supreme Court Case. I have tendered a copy to counsel. I obviously have no objection. If he feels it is time to further address it. It is similar to other cases I've cited. If I may, Your Honor, if this case in any way raises issues that are outside of what was briefed in the first prior response, a written response, I would be happy, Your Honor, for me not only to cite additional authority, but for additional briefing. Excuse me, I was tendered this case about half an hour ago, and I haven't really had a chance to read and absorb it at the level that I would like. For the record, Your Honor, it cites nothing known in proposition of law. It is simply an additional case for an identical proposition that we have cited previously. He hasn't. If you give those copies to Mr. Mangan, he will get them to us, and we will consider your request, Mr. Bernstein. Thank you, Your Honor. I have a motion. If you are ready, sir, you may proceed. I am. Good morning, Your Honors. May it please the Court, Joshua Bernstein for Appellate Philip Shipp. We're here on one issue, Your Honors, and that issue is whether Mr. Shipp alleged the gist of a claim in his post-conviction petition. In that petition, he argued that his appellate counsel offered ineffective assistance by failing to raise the denial of his motion to suppress at trial. The state, of course, argues that there is no issue, but there is, in fact. Under the case law, which interprets the Post-Conviction Hearing Act, a petitioner argues the gist of a claim if he argues, if he asserts that, excuse me, if he asserts a legal theory that is not indisputably meritless or factual allegations of it. Cut to the chase. I mean, the trial court made a ruling pursuant to people versus Villareal. There's two components, as you know, in the effect that there's the deficient performance, there's a prejudice. Correct, Your Honor. The trial court seemed to go off on a tangent that under Villareal, the defendant couldn't show prejudice because even if the initial stop was improper because the defendant left the scene and fled and resisted arrest, it justified the subsequent search, which, as you're probably going to suggest, that's not the law. Your Honor, that's true, and I would just like to make clear the state has conceded that appellate counsel's assistance was unreasonable in that the direct appeal was based entirely on an error in the law. But as far as Villareal goes, I think it's distinguishable. Villareal had to do with officers who were trying to enter a house specifically to make an arrest. Villareal and I believe it was his brother stopped them at the door and resisted the police in their effort to make an arrest. When Officer Zelaznik approached Mr. Schiff, he was not looking to make an arrest. He was looking for witnesses to a fight that may or may not have happened. And he had the right to do that. As we said in our brief, a consensual encounter does not implicate the Fourth Amendment. He had a right to approach Mr. Schiff and ask Mr. Schiff questions. Mr. Schiff answered the question, no, I don't know anything about a fight, and he and Ms. Dickens went on their way. At that point, Officers Zelaznik, without reasonable suspicion, stopped them, conducted a Terry stop, got out of his car, said don't leave. Testified at the hearing that they couldn't leave, that he wasn't going to let them leave. And essentially went on a fishing expedition. There was a seizure, I think, admittedly. But aren't there really three, if you look at the case law, three different tiers or levels here? You've got Wardlow, unprovoked flight in the presence of police, his arrival to an investigatory stop. Correct? Correct. Then you've got Villarreal. If the stop initially is valid, okay, the defendant cannot take off. That gives a right to stop in a search, correct? Or at least gives a right to pursue the defendant, to detain him. Where he's under, the stop is legitimate from the outset. A defendant can't flee then, correct? Correct, Your Honor. That's what Villarreal says, doesn't it? Yes, although in the context of an arrest, not in the context of an investigation. So now we have the others here. We have a situation where ostensibly there's no reasonable suspicion to stop and detain the defendant, and then he flees. That's different than Villarreal, correct? I believe so, Your Honor. And your argument is in that encounter where there's no legitimate legal basis to stop in the first place, he's justified in taking off, right? This is where more comes in, Your Honor. We believe there's a dividing line, and the dividing line is at a point of seizure. And the seizure was illegitimate. Mr. Shipp should have been permitted to go on his way, and he was not permitted to do that. And his attempt to disengage, after cooperating with the officers, after providing his name, which officer was the last thing he said he was looking for, the names of people who were witnesses to this alleged fight. And that essentially is what we believe. The dividing line was at the moment they were seized, it was an improper seizure, and therefore Mr. Shipp was justified. As the court said and more, if you have an illegal search – I'm sorry, an illegal seizure, a person who's running away is not resisting or obstructing the authorized act of a police officer. So why wasn't the initial seizure justified? Looking at it through the eyes of the police officer, why didn't he have enough information to conduct an investigatory stop? There was a vague call about a possible fight. He asked – And possible weapons, including handguns, right? Correct, Your Honor. Two people were walking down the street, showing no signs of having been involved in that fight. He asked them whether they knew anything about the fight. They said no, and they attempted to be on their way. He said in his testimony he had no intention of letting these people leave. These officers had no intention, as they collected in the area, they had no intention of not stopping anybody on the street. And basically, Mr. Shipp was seized at the moment he complied. Was there any information specifically describing the suspect or suspects? None whatsoever, Your Honor. In fact, if you'll listen to the DVD with the 911 call, it's very nonspecific as whether there was even a gun, whether there was even a fight. Now, I admit that – Was there a number of the individuals involved? No, Your Honor. There was no specific number. And really, what's important here is that these two people are walking down the street, giving no indication. They weren't excited. They weren't disheveled. They weren't sweating. They were walking down the street. And – Well, it was kind of cold, so for sweating, that might not be an issue, right? On that QG list, Your Honor, I don't know what he meant by – That's why he had his hands in his pockets, allegedly. Well, that is why he may have had his hands in his pockets, but that's already happened after the seizure. And we don't believe anything that happened after the seizure is relevant here. Well, the argument is that the seizure was over when he fled, and that gives rise to – the flight itself gives rise to reasonable suspicion that your client may have been up to something illegal. And this also is where we believe more comes in. The seizure was illegal. It was not an authorized act of a police officer. And his flight – and by the way, I'll note, as I'm sure you may have noticed in the record, that they searched him incident to arrest, I believe, for obstruction of justice. So the officers believed that he had obstructed justice by fleeing. In fact, he didn't. More is directly on point here. He didn't have – Zelastnik didn't have the facts required to make a stop. He was allowed to ask Mr. Shipp questions. He asked Mr. Shipp those questions. Mr. Shipp should have been allowed to go on his way. He got out of his car. He seized them. According to Moore, that's it. Game over. They should have let him go. And Mr. Shipp's attempt to disengage in his ultimate flight did not give them a reasonable – What about the fact that Zelastnik thought and probably did recognize Mr. Shipp's name? Where does that come into the – as being a victim of some sort of activity within the last month or two? Is that relevant or is that too far removed from the first stop and the initial what's your name, where were you going, what's going on? I believe, Your Honor, that it's completely irrelevant. It has nothing to do with why Mr. Shipp was stopped in the first place. And second of all, even if you do accept it as somehow relevant, there was no indication that Mr. Shipp was involved in the fight. There was no description of the people who were fighting. There was nothing to tell Officers Zelastnik that somehow Mr. Shipp was involved. And that is, you know, truly, truly just does not give him any reasonable suspicion to conduct a search. So in essence, your position is he was stopped basically on a hunch, right? That's it, Your Honor. He was stopped on a hunch. And this all could have been resolved with no further issue had Mr. Shipp said, no, we don't know anything. Mr. Dickens said, no, we don't know anything. All right. What about the appearance of the people who might have made the call saying, because this was during the initial questioning, they said, no, wait, the people you're looking for went the other way. Does that strengthen your position or weaken your position? I personally feel, Your Honor, that it's completely irrelevant, although I do find it very strange that you have someone who pulls up and tells the officer that the person you're looking for is wherever, a couple blocks north of here. And they said they made the call. I mean, that person said, we made the call. Right. And the officer ignored it. How would some just person in a vehicle know that there had been a call made unless they actually made the call? That's correct. But the point is it points the police in a different direction than what they're looking at. If anything, that weakens any kind of suspicion the officer might have had. However, it appears that the officer clamped on to his understanding that Mr. Shipp had been involved in an incident before. But, you know, as I said, the dividing line was at the moment of the seizure, and I think the rest of this is irrelevant. Everything that happened afterwards, putting his hands in his pockets, it's irrelevant. So to put it another way, the cases you're citing, Villareal and Moore, basically draw a distinction between resisting an unlawful arrest and resisting an unlawful stop, right? Correct, Your Honor. And I think that's where the trial court went wrong. The trial court cited Villareal. And if you're resisting an unlawful arrest, of course, you implicate the resisting arrest statute. If you resist an unlawful seizure, according to Moore, that does not give the police reasonable suspicion to conduct frisk. And that's really what it boils down to for us. Go ahead, Your Honor. Did the trial court consider the Kipfer case in its decision? I don't believe the trial court considered Kipfer, Your Honor. Because it has some kind of similar facts or similar situation where, you know, just mere presence was not sufficient and fleeing was not sufficient. So that was not brought up to the best of your knowledge. Not to my knowledge, Your Honor. I do know Villareal was the basis of the court. The court focused on this idea of resisting. And what about the state's reliance on this People v. Thomas case, which seems to be their foundation? From my perspective, Thomas is distinguishable. Thomas fled the moment before the police even approached. Thomas was really a potential police interaction, which is completely different than this. This is a war blow. War blow was the initial United States Supreme Court case. It says you can't flee, you know, unexplained headlong flight, as they put it, because a police show up would give rise to a suspicion. Correct, Your Honor. And in this case, rather than fleeing immediately, of course this would be a completely different case, but Mr. Shipp did not flee. He submitted to the seizure and slowly accreted police officers as he stood there, at which point they grabbed at him because he was putting his hands in his pockets. So Thomas really is not on point here. Let me ask you this. You ask in your prayer for relief that we remand the case for second stage proceedings. Yes, Your Honor. There's already been a hearing on a motion to suppress. It's our review on whether or not you've stated just the constitutional claim is deniable, but what essentially is gained by, if we were to agree with you, remanding it for a second stage proceeding when the record is complete? Well, Your Honor, I believe the Post-Conviction Hearing Act contemplates a remand for second stage, but also the state was not given a chance to raise a, I won't litigate the case for them, but I don't know if they have any kind of procedural objections that they might have had, timeliness or something like that, to the petition itself. And for that reason, it really should be remanded. That's our position. We believe this case is clear. And if the Post-Conviction Hearing Act and the case law allowed you to rule on the merits here, we think you would find in our favor and, you know, offer relief. But as I understand the procedural aspects of this case, it either we lose or it gets remanded for second stage proceedings, at least give the state a chance to respond. And I believe I'm close to the end of my time, unless Your Honors have any further questions. Thank you very much. I have an opportunity for a reply. Thank you, Your Honor. Mr. London. Good morning, Your Honors. Counsel. Your Honors, obviously the people completely disagree with both the concept of when a seizure took place as well as whether or not the fleeing attenuates the conduct. As I indicated near the end of the argument, you seem to put a lot of strength or a lot of your argument in the Thomas case. We do as far as to the judge's finding. We do also believe, though, that the totality of circumstances analysis on the seizure itself would also lend towards a successful resolution. But Thomas is, if I remember the facts right, is riding around on a bicycle with a police scanner. I'm not sure where you put a police scanner on a bike, but I guess anything can happen. And he's recently out of maybe jail or prison, and he's got a drug history. He has a history. How is that any way relevant to this case? It's relevant for the proposition that flight to prevent an illegal conduct, number one. Number two, though, again, I do understand it's light, but Henderson is almost directly on point. And I do apologize for finding Henderson. Henderson is a vehicle stop, correct? Henderson is a vehicle stop. And, you know, all the cases involving vehicles, although the same general principles apply, factually they're different. They're factually. So can you listen to my question? Of course. Somebody jumps out of a vehicle while other people are being detained and flees is not at all ordinary behavior. As opposed to a pedestrian encounter where people are encountering police, police are saying stop, and you say, no, I'd like to leave, I'd like to go on my way. Their method of travel is by foot as opposed to a passenger in a vehicle whose method of travel is by tires on a highway. So it is different. It's not directly on point. Is it factually? Factually, there's no question it's factually different. The directly on point is the fact that the defendant was grabbed. So the defendant did flee from a car, but it was after getting out of the car and was grabbed and then fled. And it was at that point that the factual, the car obviously is different. We understand the distinction between a car encounter where your method of travel is in a vehicle as opposed to an encounter where you're walking along and you say, look, leave me alone, let go of me, I'm leaving. Yes. They're different, aren't they? Yes. The getting to that point is completely different at the point of a seizure. And the reason why we cited Henderson was the fact that despite the fact that it was a car, once he had gotten out, he was in the grasp of the officer, broke free. And Henderson specifically says, by breaking free of the officer's grasp, it rendered the legality of the seizure an irrelevancy. Well, it still turns on that. Obviously, your position has to be that the initial detention encounter was justified at the outset, correct? Yes. So what specific factors can you call our attention to that justified this initial detention or seizure? Okay. First of all, we'd also like to disagree with the defense in that at exactly what point the defendant said, leave me alone. We have a much more fluid circumstance. We have a report of a fight with possible weapons. We have the individual that reported, although basically saying, get the F here before someone gets shot. So we have a circumstance when you're looking at totality of the circumstances. Before even arriving at the scene, we have that a 911 call, which has additional indicia of reliability as opposed to the walking, driving by and seeing someone. Where do you get that? A 911 call has an additional indicia of reliability. We cite. I can give you the exact case site. Unless the details of the 911 call provide that reliability. I think that's what you're talking about, right? No. I say actually the case that we cite stands for the proposition that because a 911 call can often be traced, it bears additional indicia of reliability in of itself. You look further. Is that Navarrete versus California? Did you cite that case? I did not cite Navarrete. I cited an Illinois case that may have. Well, Navarrete is a new United States Supreme Court case. In that case, the court reaffirmed its determination that reasonable suspicion does not arise from a bare bones tip. And in Navarrete, they cited Florida versus JL where the bare bones tip was that it was a young black male in a plaid shirt standing by a bus stop carrying a gun. Now, there's a lot more detail in that than there is in this case yet. Correct. The Supreme Court reaffirmed that that type of bare bones tip, a 911 call, does not provide sufficient indicia of reliability to justify a stop. In of itself. Correct. Well, what's new here that's not in the call? What indicia of reliability did the police have from this encounter that corroborated the call? Well, what corroborated the call was we had somebody then. Two people. Well, we have a man and a woman walking down the street early in the morning. We have the van that pulls up that says, I was the individual that made the call. And that should have what? They said you've got the wrong people. Correct. But again, well. That seems to go counter to your argument that adds reliability. It doesn't go counter to what we're looking at. The question here is not whether or not the officers would have or had the reasonable concept that the defendant was the perpetrator. We do have a different circumstance. Well, that's the whole problem here as you go back and forth. Even if we, for the sake of your argument, say there was reliability that a crime was committed. Correct. So what? Because the case law says an individual's presence in the area of criminal activity standing alone does not support. Correct. So even if you're saying it was reliable to the extent it showed there was a crime, how does that help you? It helps because if we parse each fact, the person's presence does not alone. The lateness does not alone. The fact that it was a high crime area does not alone justify a search or seizure. So far, so good. When you look at all of the facts, you have a concern here. What the police were doing, what the officers testified to, they have a report of a potentially serious incident. And we've cited case law saying that depending on the nature of the reported potential crime, that is another factor to consider. So we have police converging on a scene within two minutes of the report. It's not a scene unless something actually happened. What's the scene? Well, we then have later testimony that there was an altercation. They didn't witness it, but we have a report that there was an altercation. We then have testimony at trial that there was an altercation, that indeed there was. And we have the fact that the police know that a 911 call was made about an altercation. We have not only the two witnesses. Is it a fight or a potential fight? There is a fight going on. And when the question was asked, are there weapons involved, the response was, wait the F till somebody gets shot before you come down here. So they dispatch a number of officers. They're there within a minute or so, and the first officer in the scene says, there's a bunch of people in cars leaving this area, which the officers all testify to is not an area that they expect to really see anybody at this time of night, much less. So there were some high crime. Doesn't most crime happen in the middle of the night? I mean, if it's a high crime area and it's 330, that was one of the points that you you've identified. Why wouldn't there be people in this area? Why wouldn't there? Well, I mean, a high crime area means crimes, you know, go on. Doesn't necessarily mean at what time. And so I can't I can't argue or disagree with that discrepancy because we have it is a high crime area and we have officers specifically testifying to the fact that there typically are not this many people. They would be so that that's all true. Here's what I'm trying to. So what does all of this have to do with connecting these people who were seized with this crime in this report? What what particularized individual circumstances or evidence would tie them to anything other than they're walking down the street? These two. There's nothing that ties them to the commission of the crime. So you stop everybody and justify stop of everybody in the area because there was a report of criminal activity. That's exactly what the officer stated, that that because we have a report of a big fight, we have a report of multiple people possibly with a weapon being filed. The officer said for public safety reasons, we investigate and what we initially all we want to do. And indeed, in this case, they did. They stopped everybody that was there. How is that consistent with the Constitution? You're making his argument. You just can't stop everybody in the area at a hunch or a whim. You can't stop. You can stop everybody if under the other circumstances, if again, if it's noon and you have a report. Can you say by analogy, you have a bank and the silent alarm goes off without knowing whether or not an actual robbery has occurred. And the officers pull up within a minute or two. They're going to want to stop and question everybody. Now, is that a Terry stop? No, it isn't. It starts. He cooperated with the Terry stop. The defendant cooperated with the Terry stop. He stopped, gave his identity. He said the identity is in demand, but then the officer accepted just verbal identification. Both parties, not just the defendant, but his companion. Correct. So this is different than somebody who just flees from an attempted stop. He cooperated with the stop. That's actually exactly our point, is that there wasn't a Terry. We're suggesting it wasn't necessarily a Terry situation, that they did consent initially. Well, no. The officer acknowledged during a motion to suppress that he did order him to stop. The officer subjectively acknowledged that he ordered him to stop and that he would not have let him leave. He testified that he would not allow him to leave. Denise Dickens, who was the other person who was present at all times, testified that the officer did not tell him. She felt free to leave. So even that fact is up for grabs. Again, we concede obviously what the officer said, but it's not the officer's subjective opinion. It's whether a reasonable person under these circumstances would have felt free to go. I think you're going to have a hard time convincing anybody there was no seizure based on the testimony. There's no question there was a seizure. The question is when the seizure took place. So why couldn't he walk away then? He cooperated with it, he stopped, he initially complied, and he then felt that he had done all that he was required to do, and so then he takes off. What was wrong with that? He could have at a point, if he basically said, and again, this is where it's much more fluid, it isn't a consensual that immediately goes into a seizure. We have the original approach, and they didn't cooperate initially. The officer drives by and says, did you see anything? No, and they started walking. He got out of the car and said, please stop, I need to ask you some questions. And he asked them for identification. It's not clear exactly whether he said, can I see your ID or can I have your name? Ms. Dickens says, well, once he gets their names, but up until that point, we're saying that that was not a seizure. At least a reasonable person, Ms. Dickens, didn't believe it was a seizure. So then you didn't answer the question. Why couldn't they then walk away? They cooperated with it. They could have. And if they did, if they simply, and again, that's the difference between Moore and the other cases the people cites. I'm sorry, the difference between Smith and the cases other people. In Smith, the court said, third district said, basically, there wasn't a fleeing. What happened was the defendant said, didn't respond, and slowly started backing away. Moore is the only case that says, and obviously it says exactly what counsel suggests, that fleeing is not sufficient. The other cases we cite suggest that fleeing is a sufficient basis. So could he have walked away? Yes. Could he flee at that point in time, added to the other factors that gave the police reason to believe something else was going on? What else was going on? What else was going on was the... Forget what you just said. That's something else. They've already dispelled suspicion that these are the people that may have been involved in a fight. So they're... Now, what's the justification for the pat-down? The justification for the pat-down is... It's a separate consideration from the stop. Correct. At that point in time, they now have the name of the individual who they know three weeks before was involved in a gun-related offense. As a victim? Supposedly as a victim. Well, that's the only way that's the last we knew him. I don't care what. We're talking about what happened at the time. He remembered his name from some incident, and he believed him to be a victim of a fight. Actually, the testimony was that the police weren't sure if he was the victim or if actually he had shot himself. So they weren't certain. He had reported a crime. The trial judge found that the evidence that the police relied on was that he was involved in a crime, that their experience relates that people that are involved in a crime, especially in this area, often carry guns themselves either in retaliation or for protection, that he did keep putting his hands back in his pocket, which obviously in and of itself... January 31st. ...are not enough, sufficient, certainly, although even though it's January 31st, we also have evidence as far as coal that when Ms. Dickens was asked if she had weapons, she lifted her coat and shirt. So it might not have been that coal. Again, no question, putting hands in pocket in and of itself is not sufficient. But based on the concerns that the police had of putting hands back in the pocket after being told not to, that is a factor that the court can consider. So the trial judge did make factual findings that the officers had a reasonable concern for their safety. After the one officer then reaches for and potentially grabs, and we don't know if they actually, but it doesn't matter, certainly at the reach for and potentially grab, defendant breaks away. But what was he going to be arrested for? When they first had him down? When they went to grab, when they went to... He wasn't under arrest. Then it's just a stop. What's their, why can't he leave? He could have left. In theory, he could walk away, but at that point there was, we have the stop, but we also have after stop, but we have reason to frisk. And the officers testified why they felt for officer safety purposes they needed to frisk him at that point. So we have the reasonableness of the frisk as well. And the officers testified they had safety concerns. The concerns were that there was a report of an incident with a gun. We have an individual who had been involved previously. He was very nervous. He kept putting his hands back in his pocket. And yes, at that point they formulated that they were going to pat down. They did not say they were going to arrest. Did they ever say, Ms. Dickens, you can go, and Mr. Shipp, you have to stay? No. Okay, so she could have gone. She could have. And if, to be honest, if he had just walked away, we'd have a different case here. If he had said, I don't want to talk to you, may I leave, or I'm just walking away, that would be different. But he continued to cooperate. It's sort of by analogy, analogous to. So he's in a catch-22 because he cooperates? He can't walk away? Is that what you're saying? No. No, we're saying he didn't try to walk away. Right. If he had walked away, it would have been a different case. Why are you saying that if you start to cooperate initially, then you lose your constitutional right to walk away? No. What does the cooperation have to do with his right to walk away? It doesn't have to do with his right to walk away. It's worth saying that until he was actually grabbed, and that was further along the totality of circumstances continuum, that he still had a right to walk away, and if he had walked away and said, I'm not talking to you, even if the police had the concern of public safety, we'd be arguing a different case. Okay, so when is he grabbed? He's grabbed? He's grabbed after they have a concern. All of the facts leading up, the facts that they knew, his nervousness, knowing his name, and then saying, wait a second, combined on both the fact that he's putting his hands in his pocket, despite our orders, and the fact that we know he was involved in an incident with a gun, and we have reason to believe that people in these circumstances in this area are potentially armed, we felt we needed to pat him down. You could say that about just about anybody in the inner city or in a rough neighborhood. You could say that just about any person who's been a victim of a crime in a rough area. Because you've been a victim, you might be armed. Yes, you could, and under those circumstances, if that was the only factor, we would lose. The other factor is that he put his hands in his pocket on January 31st. What's the other factor? The other factors are the fact that we did have a report of a serious crime. We're already by that. We're past that. What other factor is there? Again, with all due respect, Your Honor, I don't think we can separate that. We're connecting things that are tenuous at best to justify the intrusion. Maybe it would be easier if we set a timeline. When did the seizure occur? Time frame-wise? We don't know. At most, the time from the actual 911 call to the end is eight minutes. No, but I mean, when in our scenario did the seizure occur? Because you said that there's both a seizure and there's this probable cause. When did the seizure occur? The people's position would be when he's grabbed, that up until then it was consensual. All right. We do argue in our brief that even if you say he was seized from the beginning, that the totality of circumstances still supports our position. So, although your preference is when he was grabbed, you're saying that a seizure might have occurred right as they stopped him? Because Zeleznyk said he wasn't free to go. It's not our position, but, yes, we do argue that even if that was the case, we lay out the facts that we believe would be sufficient. Well, I mean, without parsing words, if an officer says, testifies, you're not free to leave, you're seized, are you not? What more do you need? You're not free to leave, you are seized. We have a contravening fact that the other witness said he didn't say that, and she felt free to leave. Well, what did Zeleznyk answer? I did inform them, yes, they were not free to leave at any point, quote-unquote, until our investigation was finished. Yes. What more do you need beyond that to constitute a seizure? If that was accurate. Well, he testified to it. How could it not be accurate? Because we have the exact opposite testimony. Well, the trial court made a finding that there was a stop, correct? The trial court actually didn't conduct a Terry analysis because the trial court felt that the fleeing attenuated. So the trial court specifically said. It doesn't matter if the stop was illegal. Correct. Villareal says you take off, we have the right to search, period, end of discussion. Correct. It would have been a lot more helpful if the trial judge made specific findings alternatively and said, here's what I find the seizure was. And again, Justice Hudson, I certainly don't disagree that if we didn't have Ms. Dickens' testimony, that that in and of itself would have been sufficient, that in and of itself being the officer. But we have an officer who's believable and we have Ms. Dickens who's also arguably believable saying he didn't say that. And so, again, I can postulate that the officer thought that. I'm going to probably, generally speaking, attribute the officer knowing what he intended more than what Ms. Dickens said. No, but, and we completely agree with what the officer intended. The question is, was that what was conveyed to a reasonable person? Just one question. Can you just briefly comment on, we haven't ruled on your motion yet, but Henderson, how does Henderson help your argument? Henderson helps the argument by, again, despite the fact that it is an automobile case, the concern was once he didn't open the door and flee, he got out, was grabbed, then fled. And he also dumped a weapon. Yes. Yeah, that's a little different. I mean, the Supreme Court specifically says the stop was not justified. Correct. But when he opened the door and the gun fell out and he left, that was... I think he fled and then dropped the gun. The gun is there. Yes. Do we have a gun anywhere here? No. We have somebody with their hands in their pockets. No, we do not have a gun. And worse at this point. Correct. Okay. Thank you. Thank you. Mr. Bernstein? Anything, Your Honor? Anything you need to clarify? Excuse me? Anything you'd like to clarify. Actually, Your Honors, I believe all the ground that needs to be covered has been covered. I just wanted to come up and tell Justice Hutchinson that I checked the court's order and the court did not cite Kipfer. Okay. Unless you have any further questions, Your Honors, thank you very much. That was a clarification. Thank you. We'll take this matter under advisement. A decision will be made in due course. Thank you, gentlemen, for your argument. And thank you, Mr. Bernstein, for the ride out. Thank you.